IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 17, 2024

**STATE OF TENNESSEE v. KENNETH RAY NILES**

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2015-CR-176   Suzanne M. Lockert-Mash, Judge**

_____

**No. M2023-01603-CCA-R3-CD**
_____

The Defendant, Kenneth Ray Niles, appeals from his convictions in the Dickson County Circuit Court for two counts of first degree premeditated murder, two counts of first degree felony murder, and one count each of aggravated arson, a Class A felony; especially aggravated robbery, a Class A felony; theft of property, a Class D felony; and aggravated criminal trespass, a Class A misdemeanor.  *See* T.C.A. §§ 39-13-202 (2014) (subsequently amended) (first degree felony murder), 39-14-302 (2018) (aggravated arson), 39-13-403 (2018) (especially aggravated robbery), 39-14-103 (2018) (theft of property), 39-14-406 (2014) (subsequently amended) (aggravated criminal trespass).  He received an effective sentence of life plus fifty years.  The Defendant contends that (1) the jury's verdict was contrary to the weight and sufficiency of the evidence, (2) the trial court erred by failing to exclude evidence found in the Defendant's wife's truck, and (3) the trial court erred by admitting photographs of the victims.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Paul J. Bruno (at trial and on appeal), Nashville, Tennessee, and Michael Hibdon (at trial), Murfreesboro, Tennessee, for the appellant, Kenneth Ray Niles.

Jonathan Skrmetti, Attorney General and Reporter; Christian N. Clase, Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; Talmage Woodall and Jennifer Stribling, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to the April 2015 robbery and murder of John Goldtrap and Marley McDonald and fire damage to Mr. Goldtrap's duplex apartment. A Dickson County Grand Jury indicted the Defendant for two counts of first degree premeditated murder, two counts of first degree felony murder, and one count each of aggravated arson, especially aggravated robbery, especially aggravated burglary, and theft of property.

At the trial, Ms. McDonald's mother, Carol Shaw, testified that, at the time of her death, Ms. McDonald was age twenty-three and had a two-year-old daughter. Ms. Shaw identified a photograph of Ms. McDonald with her daughter which was received as an exhibit.

Rosalind Sowell, Dickson County Director of Communications, testified that a 9-1-1 call was received on April 14, 2015, at 4:47 a.m., reporting a fire at Mr. Goldtrap's apartment on McFarland Lane.

Martha Pennington testified that in April 2015, she lived in the duplex apartment attached to Mr. Goldtrap's apartment and shared a driveway with Mr. Goldtrap and Susie Sasco, her landlord. Ms. Pennington said that, normally, when she was in her living room, she could not hear noises from Mr. Goldtrap's apartment. She said that a white minivan was often parked at Mr. Goldtrap's apartment and that she had seen guns and cash in his apartment. The night before the fire, she watched television with the volume turned up and never saw the Defendant. She recalled waking up on April 14 between 4:00 and 4:30 a.m. and hearing loud noises through the common wall with Mr. Goldtrap's apartment that sounded like someone moving something heavy and metallic. She said she did not hear a gunshot but smelled smoke coming from her closet after which she left her apartment and went outside and knocked on Mr. Goldtrap's door. She said the door was hot and no one answered. She unsuccessfully tried to break a kitchen window, and she called to the victims, but no one answered. She said that Mr. Goldtrap's apartment was engulfed in flames at that point and that she called 9-1-1 and Ms. Sasco.

Susie Sasco, the property manager for the duplex apartment where the victims lived, testified that she left on a trip the day before the fire. She said she was familiar with the Defendant, who visited the victims "a lot." She stated that she would have alerted the police if she had seen the Defendant at Mr. Goldtrap's apartment before the fire because he was not welcome there "anymore."

Thomas Sasco, Jr., Ms. Sasco's son, testified that at the time of the fire he lived with his parents and was outside Mr. Goldtrap's apartment when the first responders arrived at the scene. He said that the victims had moved in approximately three or four

months before the fire.  He recalled seeing a white minivan at Mr. Goldtrap's apartment "three or four times" and said it was parked at Mr. Goldtrap's apartment on the evening before the fire was discovered.

James Stokes with the Dickson Fire Department testified that he was dispatched to the fire, that he had to break the apartment's door jamb to gain entry through the front door, and that there appeared to be furniture pushed up against the door, making it difficult to push open the door.

Dickson Fire Department Lieutenant Jeffrey Salewsky testified that he was called to the apartment fire and that he found Mr. Goldtrap's body on the bedroom closet floor, that it was covered with clothes, that there was blood around Mr. Goldtrap's head, and that there was a safe with an open door in the closet.

Dickson Police Department Captain Todd Christian testified that, when he arrived at the scene of the fire between 4:00 and 5:00 a.m., Mr. Goldtrap's kitchen door's deadbolt was engaged.  Captain Christian said that he saw the Defendant, who asked about the victims, identified himself as family, and was directed to a staging area for family members.

Former Dickson Police Department Detective James Eubank testified that the apartment was still on fire when he arrived.  He stated that he walked around the crime scene tape perimeter as soon as he arrived and that he coordinated his investigation with Tennessee Bureau of Investigation (TBI) agents.  Photographs of the scene were received as exhibits, including a photograph showing a key and a blue key tag with Mr. Goldtrap's apartment number, lying on the ground at the corner of McFarland Lane, just outside the crime scene tape perimeter.  Mr. Eubank identified a photograph showing the Defendant standing in the area where the key and tag were found.  Mr. Eubank stated that the Defendant was "causing a scene" by loudly requesting information and claiming to be family.  Mr. Eubank stated that when he walked around the perimeter earlier that morning, the key and key tag were not there and that the key and key tag appeared only after the Defendant had been in the area.  Mr. Eubank said that the Defendant was only wearing socks at the scene and that the Defendant had soot on one hand and medical tape covering a finger on his other hand.

Mr. Eubank testified that on April 14, 2015, he interviewed the Defendant at the Dickson Police Department.  During the interview, the Defendant said that he was at Mr. Goldtrap's apartment on April 13, the evening before the fire, from 7:30 until 9:30 p.m. The Defendant stated that Mr. Goldtrap was his first cousin, that they were close, but that he was not fond of Ms. McDonald.  Mr. Eubank read to the jury the Defendant's signed written statement which stated:

I understand that this interview is strictly voluntary on my part. I understand that I did not have to agree to this interview.

. . . I drive a black 1997 F-150 and it belongs to my wife. I have a job at Christies used tires, but I haven't worked lately.

My wife's cousin's name is Christopher John Goldtrap. . . . I am over at his house pretty much every day. We are really tight and his girlfriend is jealous of how close we were. He is like my brother. I know that he deals drugs and I know that he has a lot a lot of guns. I know that he would always carry a gun when he was selling pills. I think he carries a 380 LCP Ruger on him. We both really love guns. I know Chris has a safe in the closet in his house too. I do not know if he keeps his pills in it, but he does keep the guns in it. A lot of people know that Chris has a safe.

Chris has a girlfriend named Mickey. I do not know her last name. John and Mickey live together at this residence. She has a daughter that is 3 years old. I think Mickey works at St. Thomas in Nashville.

I was over at Chris's house last night from 7[:]30 to about 9[:]30. I think I stayed for a couple of hours. We were talking about a deal I had set up around lunch time that day. Chris told me he didn't want to do the deal. He said he didn't want to go back to Nashville to get any more pills. I also watched a TV show over at his house last night. Chris and I were also on the internet looking at guns. She would follow him around everywhere in the house. But there was no animosity between anyone in the house.

I remember another guy being there when I showed up at Chris's house last night. I do not remember his name. I'm pretty sure he works at [P]izza [H]ut. He came to buy some pills. He also had some [X]anax with him that he owed Chris. I'm pretty sure he used last night. I think Chris and Mickey used last night too. They use all of the time. I do not think I was the last person to be at the house last night. Chris would sometimes sell pills till four in the morning.

When I left Chris's house around 9:30 I went home and I chilled. I did call Chris around 9:30 when I got home but he didn't answer.

Recently Chris told me about Mickey burning a hole in the couch with a cigarette. He said she nodded off on the couch, because she took a whole pill, crushed it, and snorted it. But I wasn't there when this happened.

Mr. Eubank testified that the Defendant provided a list of items missing from Mr. Goldtrap's apartment, including gun boxes and guns. Mr. Eubank said that when reviewing other police case reports, he noticed what appeared to be an unrelated report dated April 26, 2015, and that items described in the report were consistent with those missing from Mr. Goldtrap's apartment. Mr. Eubank stated that the items had been recovered near Cowan Road, located close to the Walmart Supercenter in Dickson.

On cross-examination, Mr. Eubank testified that it could have been thirty to forty-five minutes between his time examining Mr. Goldtrap's apartment and returning to the area where he found the key and key tag. Mr. Eubank stated that a woman appeared at the apartment at 4:45 a.m. on the morning of the fire saying she was there to repay Mr. Goldtrap for money she used to take a GED examination. Mr. Eubank did not consider her to be a suspect because she lived too far away from Mr. Goldtrap's apartment and was not at the scene until after the fire department had arrived. Mr. Eubank acknowledged that he did not confirm that the black substance on the Defendant's hand was soot. Mr. Eubank confirmed that the TBI agent wrote the statement signed by the Defendant based upon what the Defendant said during the interview. On redirect examination, Mr. Eubank stated that the Defendant referred to Ms. McDonald as a "b----" during his interview but refused to sign his statement until this portion was removed.

Dickson Police Department Detective Tony Campbell testified that on April 26, 2015, he was dispatched to assist with a truck that had run out of gas on Cowan Road near the Walmart Supercenter. Detective Campbell said one of the men with the truck told Detective Campbell that while waiting for assistance to arrive, the man went to "relieve himself" in the woods, approximately twenty-five to thirty yards away from the road, and found three gun cases and a .22-caliber Sentinel revolver. Detective Campbell said he collected the items and identified them as a Glock gun case, a SIG Sauer gun case, and a Heckler and Koch pistol case. Detective Campbell stated that the .22-caliber revolver had live rounds and fired cartridge casings in the cylinder. Detective Campbell stated that one of the men with the truck was Timothy Williams, Mr. Goldtrap's first cousin. On cross-examination, Detective Campbell confirmed that all of the items found were within four feet of each other.

Metropolitan Nashville Chief Medical Examiner and forensic pathology expert Feng Li testified that he performed autopsies on the victims. Dr. Li concluded that Mr. Goldtrap received a lethal gun shot to the back and top region of his head from a minimum of three feet and that the bullet entered and exited the skull. Dr. Li stated that, generally, gunshot wounds to the brain caused death within minutes. Dr. Li said that Mr. Goldtrap's body also showed evidence of burning, which may or may not have been lethal. Dr. Li said there was no soot in Mr. Goldtrap's airways, making it unlikely he died from smoke inhalation. Mr. Goldtrap's toxicology report showed the presence of

alprazolam and a high level of oxymorphone. Dr. Li opined that Mr. Goldtrap's cause of death was a gunshot to his head and that the manner of death was homicide.

Dr. Li testified that Ms. McDonald received a penetrating gunshot to her left temple, that he retrieved two bullet fragments during the autopsy, and that she suffered primarily third degree burns on more than eighty percent of her body. Dr. Li said there was no soot in Ms. McDonald's airways, making it likely that she was already dead when the fire started. Dr. Li said that during his examination, he found wire wrapped around Ms. McDonald's mouth and that she had suffered blunt force trauma to the top of her head. He opined that the wire would have made it difficult for Ms. McDonald to speak. Ms. McDonald's toxicology report showed the presence of alprazolam and oxymorphone. Dr. Li opined that Ms. McDonald's cause of death was a gunshot to her head and that the manner of death was homicide.

On cross-examination, Dr. Li testified that the toxicology report showed that Mr. Goldtrap had a therapeutic level of alprazolam and enough oxymorphone to cause an overdose. On redirect examination, Dr. Li conceded that it was possible Mr. Goldtrap was heavily sedated or immobilized from the amount of oxymorphone he had ingested.

Dickson Fire Department Captain and fire investigation expert Robert Street testified that he investigated the April 14, 2015 fire and found burn patterns along the living room wall that indicated part of a sectional couch had been pushed up against the front door. Captain Street said that holes, spots, and "dimples" in the couch's foam cushions showed what may have been pour patterns from accelerants. He also stated that the ceiling appeared more charred over the area where the accelerant-patterned couch cushions were located, indicating more intense heat in that area. According to Captain Street, fire patterns in Mr. Goldtrap's bedroom indicated that the bedroom closet door was closed at the time of the fire and that the fire did not originate inside the closet. Captain Street stated that the fire in Mr. Goldtrap's bedroom was a "nonconnected fire" because the fire burned a hole in the bedroom door from the inside out and that a "nonconnected fire" denoted a separate fire, with its own point of origin. He also noted that firefighters cleaned a portion of the bedroom floor and found that pour patterns were visible in the areas of increased charring.

Captain Street testified that the fire in the guest bedroom was a "nonconnected fire" because it originated from the guest bedroom mattress. He identified three separate fires at the apartment: one in Mr. Goldtrap's bedroom, one in the guest bedroom, and one in the living room originating from the couch. Captain Street stated that floorboards and other items from the apartment did not test positive for accelerants and that accelerants often were consumed by a fire or were washed away during firefighting operations. Captain Street opined that arson was the cause of the fires.

TBI expert firearms examiner Agent Alex Brodhag testified that he created diagrams of the crime scene and identified and tagged evidence. Agent Brodhag said that the following items were found in the bedroom closet where Mr. Goldtrap's body was located: a .357-caliber SIG Sauer cartridge casing lying on the floor near Mr. Goldtrap's head, a bullet fragment found in the closet wall, a bullet fragment found under the closet safe, an unfired .32-caliber Smith and Wesson long bullet found under the safe, multiple unfired .357-caliber SIG Sauer bullets, twelve unfired .380-caliber bullets, a Ruger plastic gun box, and a variety of other ammunition. Agent Brodhag said the .357-caliber SIG Sauer cartridge casing found near Mr. Goldtrap's head was made by Hornady and had markings consistent with those made by Glock and other gun manufactures. Agent Brodhag said that a .357-caliber Glock pistol is a semi-automatic pistol that automatically ejected a cartridge casing once a bullet was fired. He said that the .357-caliber cartridge casing was lying on the floor beside a reddish-brown stain, believed to be Mr. Goldtrap's blood. Agent Brodhag said that the bullet fragment recovered from the closet wall was located approximately eighteen and one-half inches above the closet floor. Agent Brodhag said a Glock pistol box for a .357-caliber SIG Sauer pistol was recovered at Cowan Road.

Agent Brodhag testified that he made a video recording that showed a key and a key tag lying at the corner of McFarland Lane and a recording that showed the location of cartridge casings and bullet fragments near Mr. Goldtrap's body in the closet, and blood and a pair of eyeglasses in the bathroom tub. Agent Brodhag stated that the recording showed an open safe in the closet that did not appear to have been forced open. The recording also depicted blood on the closet wall, inside the safe, and on the floor around Mr. Goldtrap's head.

Agent Brodhag testified that two bullet fragments, which were consistent with a .22-caliber revolver, were recovered from Ms. McDonald's body during the autopsy. Agent Brodhag said that a Walther P-22 .22-caliber, semi-automatic pistol, which subsequent proof established was found on April 28, 2015, by TBI Agent Joey Boyd, and a Sentinel .22-caliber revolver were recovered near Cowan Road. The Sentinel's revolver cylinder contained three fired .22-caliber cartridge casings and six unfired bullets. Agent Brodhag determined that the bullet fragments from Ms. McDonald's body had been fired by the Sentinel .22-caliber revolver. Photographs of the cartridge casings, bullet fragments, video recordings from the crime scene, and Agent Brodhag's report were received as exhibits.

On cross-examination, Agent Brodhag testified that he could not determine the model of firearm that fired the bullet fragment found in the bedroom closet wall because it was consistent with both a 9-millimeter and a .357-caliber SIG Sauer. Agent Brodhag said that he could not determine the model or brand of firearm that fired the .357-caliber

SIG Sauer bullet fragment found near Mr. Goldtrap's head because it was consistent with many firearms that use that type of rifling.

TBI microanalysis expert Agent Rielley Gray testified that she performed gunshot primer residue and ignitable liquid residue analyses on items from the apartment, the Defendant's home, and Ms. Niles's truck. Agent Gray said that gunshot primer residue consisted of microscopic heavy metals left after a gun was fired but that she did not find evidence of gunshot residue on the Defendant's shoes. Agent Gray said that charred wood from Mr. Goldtrap's bedroom, charred sofa padding from the living room, charred items from the bedroom closet, and charred padding from the mattress in the guest bedroom did not reveal the presence of any ignitable liquid residue. According to Agent Gray, one gas can from Ms. Niles's truck tested positive for the presence of an evaporated gasoline product. Agent Gray said that the gloves from the truck's console tested positive for a mixture of an evaporated gasoline product and a heavy petroleum distillate and that gloves from the truck's backseat tested positive for the presence of a heavy petroleum distillate. Agent Gray stated that a pair of the Defendant's shoes tested positive for the presence of a heavy petroleum distillate.

TBI forensic biology expert Agent Laura Boos testified that the cartridge casing found near Mr. Goldtrap's head, the bullet fragment from the closet wall, and blood from the closet wall tested positive for Mr. Goldtrap's DNA. Agent Boos testified that the blood on the eyeglasses found in the bathtub, the blood stain on the side of the bathtub, and the key tag found near the apartment tested positive for Ms. McDonald's DNA. Agent Boos said that two small blood stains on the back of the second-row seating in Ms. Niles's minivan tested positive for Mr. Goldtrap's DNA. Agent Boos stated that a pistol box recovered from Cowan Road tested positive for Mr. Goldtrap's DNA. According to Agent Boos, no DNA profile was obtained from many items from the apartment due to insufficient or degraded DNA. She said high heat could have degraded the DNA.

On cross-examination, Agent Boos testified that the key tag tested positive for a limited DNA profile that was not consistent with the Defendant or his wife. Agent Boos said that the only blood found in the minivan were the two spots that were tested. Agent Boos confirmed the Defendant's brown jacket tested negative for blood. On redirect examination, Agent Boos said that DNA found inside the gloves from Ms. Niles's truck was consistent with the Defendant's DNA and that wearing gloves generally prevented the transfer of DNA to other surfaces.

Bobbie Niles testified that she had been married to the Defendant for twenty-five years, that Mr. Goldtrap was her first cousin, and that she was not very close to Mr. Goldtrap. Ms. Niles said that she and the Defendant lived less than two miles from Mr. Goldtrap's apartment and near a Shell station. She said she worked for the State of Tennessee at a Career Center, from which she was authorized to use a white Mazda

minivan for work-related purposes, although she and the Defendant occasionally used it for personal matters. She also noted that she owned a Ford truck. According to Ms. Niles, the Defendant used drugs every day, he was addicted to "pills," and Mr. Goldtrap provided drugs to the Defendant.

Ms. Niles testified that on April 13, 2015, the day before the fire, the Defendant was "pill sick" because he did not have access to pills. Ms. Niles said that she gave the Defendant her prescription pain medications and that the Defendant processed them for intravenous use. According to Ms. Niles, on the day before the fire, the Defendant left and returned to their home several times. She said that, at some point, the Defendant returned with pills he said he received from Mr. Goldtrap, that the Defendant was no longer pill sick, and that the Defendant left again that evening to return to Mr. Goldtrap's apartment to watch a movie. Ms. Niles stated that the Defendant told her that the next time she refilled her prescription, she needed to give some to Mr. Goldtrap in exchange for the ones he had given to the Defendant.

Ms. Niles testified that she went to bed that night and woke early on April 14, 2015, to find her minivan and the Defendant were not home. She acknowledged that she called the Defendant's cell phone at 4:16 a.m. and 4:20 a.m., but he did not answer. Ms. Niles said the Defendant returned home sometime after 4:20 a.m. and told her that he had been to Walmart to buy cigarettes because the Shell station was out of his brand. Ms. Niles stated that she went to bed and slept until a friend woke her by knocking on the door, alerting her and the Defendant to the fire. Ms. Niles said she dressed and drove the Defendant to Mr. Goldtrap's apartment in the minivan where the Defendant got out of the minivan, inquired about the fire, and was directed to a staging area for family members. According to Ms. Niles, they stayed approximately fifteen to twenty minutes before returning home.

Ms. Niles testified that on the afternoon of April 14, 2015, she and the Defendant went to the police station, where the Defendant told her to tell officers that he was home all night. Ms. Niles said that she complied with the Defendant's request. Ms. Niles said that when they returned home from the police station, the Defendant cleaned the minivan. A photograph of the inside of the minivan showing cleaning supplies, including a carpet stain remover, was received as an exhibit. Ms. Niles confirmed that she had not purchased the carpet stain remover and had never previously used it to clean the minivan. Ms. Niles stated that she admitted to law enforcement that she lied in her earlier statement about the Defendant's being home the night of the fire and that law enforcement officers searched her home for the shirt, jeans, and brown jacket the Defendant wore the night of the fire, but they were unable to find the items.

On cross-examination, Ms. Niles testified that the Defendant had known Mr. Goldtrap for over twenty years and that he had assisted Mr. Goldtrap after a motorcycle

accident. Ms. Niles confirmed that the Defendant routinely cleaned the minivan and drove it to Mr. Goldtrap's apartment. Ms. Niles said Mr. Williams was her and Mr. Goldtrap's first cousin. Ms. Niles acknowledged that Mr. Goldtrap sold pills and guns. Ms. Niles stated that the Defendant worked at a tire shop, where many workers wore gloves. According to Ms. Niles, the Defendant was trying to sell a gun and holster Mr. Goldtrap gave him. Ms. Niles stated that the Defendant photographed the gun and holster to sell on the internet and that the Defendant was supposed to have returned the gun and holster to Mr. Goldtrap before the fire. Ms. Niles acknowledged that the Defendant had access to pills from sources other than Ms. Niles and Mr. Goldtrap.

Ms. Niles testified that the Defendant wore jeans, a camouflage shirt, a brown jacket, and shoes when he returned from Mr. Goldtrap's apartment on the evening of April 13, 2015. She said that, earlier in the day, the Defendant cut his finger sharpening a knife. Mrs. Niles stated that when she saw the Defendant in the early morning hours of April 14, he did not smell of smoke or gasoline, he did not have any bruises or torn clothes, and he did not have any noticeable blood on his clothes.

Monroe Hargrove, Mr. Goldtrap's father, testified that his son was age twenty-seven when he died. Mr. Hargrove said Ms. Niles was his niece. Mr. Hargrove employed the Defendant at a tire store until he was fired in the fall of 2014. Mr. Hargrove said that the Defendant did not visit Mr. Goldtrap after the motorcycle accident or assist with his rehabilitation and that the Defendant and Mr. Goldtrap were not friends but had "a connection because of drugs and pills." A photograph of Mr. Goldtrap and his five-year-old daughter was received as an exhibit.

TBI Agent Joey Boyd testified that he made a video recording of the apartment immediately after the fire had been extinguished. The recording and photographs of the apartment and the victims were received as exhibits. Agent Boyd identified Ms. McDonald's body in the living room, Ms. McDonald's blood-covered eyeglasses in the bathtub, and a pool of blood and water in the bathtub. Agent Boyd stated that the bathroom had smoke but no fire damage. Agent Boyd said that Ms. McDonald's blood was found only in the bathroom. Agent Boyd opined, based on Ms. McDonald's gunshot wound, head laceration, and the blood found in the bathroom, that Ms. McDonald was killed in the bathroom. Agent Boyd stated that rigor mortis could have occurred during the hours between the time when the Defendant said he arrived home around 9:30 p.m. and the time firefighters arrived at the scene of the fire at 5:00 a.m. the next morning. Agent Boyd said that Ms. McDonald's severely charred body was located near the couch in the living room. Agent Boyd identified photographs of the closet showing Mr. Goldtrap on the floor with blood around his head, on the wall, in the safe, and on ammunition boxes. Agent Boyd identified other photographs from the closet showing a .357-caliber bullet fragment and a different caliber unfired bullet on the floor in Mr. Goldtrap's blood. Agent Boyd said that the bullet fragment on the floor and the bullet

fragment from the wall contained Mr. Goldtrap's DNA. Agent Boyd stated that the closet contained no 9-millimeter cartridge casings, only the fired .357-caliber cartridge casing. Agent Boyd opined that Mr. Goldtrap was killed in the closet with a .357-caliber gun. Agent Boyd said that his investigation revealed that Mr. Goldtrap sold pills, guns, and ammunition, which he kept in the closet safe. Agent Boyd opined, based on Mr. Goldtrap's blood being found inside the safe, that Mr. Goldtrap was killed after the safe was opened.

Agent Boyd testified that when he arrived at the scene, crime scene tape had been used to create a perimeter around the apartment, extending to the corner of McFarland Lane. Agent Boyd said that during his initial briefing with local police, a key and key tag were not mentioned. According to Agent Boyd, no one saw the key or key tag before the Defendant was seen at the corner but they were found at the corner after the Defendant stood there.

Agent Boyd testified that the victims' cell phones were never recovered. He said that he obtained the cell phone records for the victims and a phone shared by the Defendant and Ms. Niles. Agent Boyd said that text messages from Mr. Goldtrap's phone related to transactions regarding guns and pills, that Mr. Goldtrap's last outgoing phone call was made at 7:45 p.m. on April 13, 2015, and that Ms. McDonald's phone last connected to a cell tower at 7:28 p.m. on April 13.

Agent Boyd testified that the Defendant sent a text message on April 12, 2015, to Mr. Goldtrap saying the Defendant was "sick" and seeking opiates. Mr. Goldtrap's last text message to the Defendant was sent on April 14, at 7:57 p.m., and stated, "[S]--- kenny I bend over backwards for you bubba all the time dude I love you man but if I can't do it I can't do it[.]" On April 14, at 9:33 p.m., the Defendant called Mr. Goldtrap, which was forwarded to voicemail, and sent a text message to him at 10:25 p.m. asking to borrow five dollars to purchase cigarettes.

Agent Boyd testified that the Defendant admitted he had been at Mr. Goldtrap's apartment on April 13, 2015, between 7:30 p.m. and 9:30 or 10:00 p.m., and that he had driven the white minivan. Agent Boyd said that officers executed a search warrant for the minivan, in which they found cleaning supplies and two spots of Mr. Goldtrap's blood. Agent Boyd confirmed that Mr. Goldtrap's blood was found only in the bedroom closet and in the minivan. Agent Boyd stated they also searched Ms. Niles's truck and found two gas cans, various types of wire, and gloves.

Agent Boyd testified that on April 26, 2015, police officers recovered a .22-caliber Sentinel revolver and a gun box from an area along Cowan Road, behind the Dickson Walmart Supercenter. On April 28, he and TBI agents returned to that location to conduct a more thorough search and recovered ammunition, a .22-caliber unfired bullet, a

brown leather holster, and gun boxes. Agent Boyd said that a gun box discovered on April 26 tested positive for Mr. Goldtrap's DNA but the other items recovered from Cowan Road did not. Agent Boyd stated that the .22-caliber Sentinel revolver recovered from Cowan Road contained three cartridge casings and six unfired bullets. According to Agent Boyd, the bullets in the revolver were similar to the bullet fragments recovered from Ms. McDonald's body.

Agent Boyd testified that the Defendant's cell phone contained an April 12, 2015 photograph of a revolver, holster, and ammunition which appeared to lay on the Defendant's kitchen table. Agent Boyd said the revolver in the photograph was never recovered but that the holster recovered from Cowan Road was consistent with the holster in the photograph.

During Agent Boyd's testimony, an audio recording of the Defendant's prior sworn testimony was played for the jury and received as an exhibit. In the recording, the Defendant testified that he and Mr. Goldtrap were close, that they lived less than two miles apart, that he saw Mr. Goldtrap daily, and that he helped and supported Mr. Goldtrap after Mr. Goldtrap's 2014 motorcycle accident. The Defendant said he met Ms. McDonald around the time of Mr. Goldtrap's accident, and he denied referring to her as a "b----." According to the Defendant, Mr. Goldtrap traded pills and guns and had as many as 100 customers, including the Defendant. The Defendant said Mr. Goldtrap had a home entertainment system with wire connecting various components. The Defendant acknowledged that he, Ms. Niles, Mr. Goldtrap, and Ms. McDonald had a "very bad pill problem."

The Defendant testified that Mr. Goldtrap had been in Nashville obtaining pills on the morning of April 13, 2015. The Defendant said that he arrived at Mr. Goldtrap's apartment around 6:45 p.m. on April 13, and that he stayed one and one-half or two hours. The Defendant identified a camouflage shirt and brown jacket that he wore on April 13 and 14. The Defendant admitted that he, Mr. Goldtrap, and Ms. McDonald "did pills" that evening. The Defendant said that he left because Mr. Goldtrap wanted to be alone with Ms. McDonald and that he went and bought two packs of cigarettes at a gas station before returning home. According to the Defendant, he and Ms. Niles took pills and "got high" when he got home, and he cut his finger while cutting pills. The Defendant said he went to Taco Bell at 12:30 a.m. on April 14 and returned home by 12:45 a.m. When asked about an April 14 surveillance video recording showing a white minivan on Henslee Drive at 4:41 a.m., the Defendant said it was not his minivan. A photograph of the area near the Defendant's home on Reeves Street and its intersection with Henslee Drive was received as an exhibit. The Defendant stated that he was at home the remainder of the night until a friend knocked on the door the morning of April 14 and that he did not put on shoes before running out of his home and down his backyard toward Mr. Goldtrap's apartment to look for smoke. The Defendant said Ms.

-12-

Niles picked him up in the minivan and they drove to Mr. Goldtrap's apartment. The Defendant denied having a key or a key tag to Mr. Goldtrap's apartment.

The Defendant testified that he voluntarily gave a statement to law enforcement on April 14, 2015. He denied asking Ms. Niles to tell officers that he was at home on the night of April 13 and said she lied when she told officers that he cleaned the minivan on April 14. The Defendant testified that he traveled to Nashville soon after the fire and cleaned the minivan when he returned. When asked about the gas cans in the truck, the Defendant said that Mr. Goldtrap gave him one of the gas cans and that he purchased the other gas can as a spare. When asked about other items in the truck, the Defendant stated that he used gloves when working at the tire shop and used the wires for the truck's speakers.

The Defendant testified that Mr. Goldtrap borrowed the minivan around Easter 2015 to go shopping, that Mr. Goldtrap's daughter stayed with the Defendant, and that Mr. Goldtrap's finger was bleeding when he returned having cut it on a "jelly jar" while shopping. The Defendant said the gun, holster, and ammunition in the photograph on his cell phone were items Mr. Goldtrap wanted to sell to him. The Defendant stated that he returned those items to Mr. Goldtrap on April 12, that he did not harm or steal from Mr. Goldtrap or Ms. McDonald, and that he did not set fire to the apartment.

On cross-examination, the Defendant could not explain why the camouflaged shirt he wore on April 13 and 14, 2015, did not smell like cigarette smoke, even though he and Mr. Goldtrap and Ms. McDonald smoked in the apartment. The Defendant said the shirt must have been washed. The Defendant also stated that his wife was a liar. The Defendant did not recall sending Mr. Goldtrap an April 13 text message stating, "[L]ook bro, they are my pills will you please help me out." The Defendant did not recall receiving a text message from Mr. Goldtrap stating, "I don't have it Kenny and I can't get any more pills." The Defendant said he did not recall why he sent a text message to Mr. Goldtrap stating, "I need to get me a collection going."

The Defendant testified that he produced income from selling pills, that he went to get cigarettes at 8:45 p.m. on April 13, 2015, and that he sent a text message to Mr. Goldtrap at 10:25 p.m. asking to borrow five dollars to purchase cigarettes. The Defendant denied that his 10:25 p.m. text message was an attempt to conceal the murders but, instead, was an attempt to determine whether he could come to Mr. Goldtrap's apartment. The Defendant said he frequently cleaned the minivan and would have used the cleaning products found in it.

The Defendant testified that, on the morning of April 14, 2015, he had a bandage on his hand which he said might not have been noticeable on him in the video-recorded news report of him at the scene of the fire. The Defendant said he gave a statement to

law enforcement later that day and that his hand was bandaged. The Defendant stated that Mr. Eubank lied when Mr. Eubank claimed the Defendant called Ms. McDonald a "b----." The Defendant said he was not familiar with the contents of Mr. Goldtrap's safe. The Defendant confirmed he had different types of wire in his truck. The Defendant acknowledged that he lied in the text message he sent to Mr. Goldtrap indicating he needed money for cigarettes. The Defendant said he did not answer the 4:16 a.m. and 4:20 a.m. cell phone calls from Ms. Niles because he was asleep downstairs at their home.

Agent Boyd testified that the Defendant admitted being at Mr. Goldtrap's apartment during the time frame when the victims' cell phones stopped connecting to cell towers. Agent Boyd said Mr. Goldtrap's cell phone records showed that the calls Mr. Goldtrap received after 9:00 p.m. were forwarded to voicemail because Mr. Goldtrap's cell phone stopped connecting to a cell tower. Agent Boyd said that a cell tower would not register a phone that is out of the service area, powered down, or physically destroyed.

Agent Boyd testified that on January 14, 2016, Ms. Niles gave officers a plastic bag containing the Defendant's camouflage shirt he had worn on the night of the fire. Agent Boyd said that the TBI found the Defendant's brown jacket in June 2017 at the Defendant's storage unit. According to Agent Boyd, witness interviews and associated photographs connected Mr. Goldtrap to the pistol boxes and the .22-caliber Sentinel revolver found at Cowan Road. Agent Boyd said Mr. Goldtrap's DNA was found on one of the pistol boxes. Agent Boyd opined that the items found on Cowan Road had been taken from Mr. Goldtrap's safe. Agent Boyd identified a Ruger .380-LCP-caliber magazine found at Cowan Road and a Ruger pistol manual found in the closet near Mr. Goldtrap's body. Given the type of gun boxes recovered, Agent Boyd estimated that guns corresponding to those boxes would have been worth approximately $3,525.

Agent Boyd testified that the TBI reviewed surveillance recordings from the Shell station and other area businesses for April 14, 2015, between 4:39 and 4:45 a.m. He said that the recordings showed a white minivan, matching Ms. Niles's minivan, turning onto Henslee Drive and approaching the Shell station before turning onto Taylor Street. Agent Boyd said the recordings showed a white minivan later traveling in the direction of the Walmart Supercenter and that the recording from the Shell station showed a white minivan on the road at 4:41 a.m. on April 14, six minutes before the victim's neighbor called 9-1-1 to report the fire.

Agent Boyd testified that he reviewed the Shell station surveillance recording from April 14, 2015, from midnight until 5:00 a.m., but that he never saw the Defendant. Agent Boyd noted that the Defendant told Ms. Niles that he went to the Shell station to purchase cigarettes on April 14 at 4:00 a.m., that the Shell station was out of his brand,

and that he went to Walmart for cigarettes. According to Agent Boyd, his investigation indicated that the Defendant was the last person to see the victims alive and that the Defendant was at the victims' apartment when the victims' cell phones stopped connecting to a cell tower. Agent Boyd said that, based upon his investigation, the Defendant and Mr. Goldtrap argued about pills on April 13, that the Defendant knew the victims had used opioids on April 13, that the Defendant possessed Mr. Goldtrap's guns, that the Defendant cleaned the minivan that contained Mr. Goldtrap's blood, and that the Defendant drove the minivan in the vicinity of Mr. Goldtrap's apartment and Cowan Road between 4:00 and 5:00 a.m. on April 14.

On cross-examination, Agent Boyd testified that no one tested the key found at the scene to determine if it opened any locks at Mr. Goldtrap's apartment. Agent Boyd said that the revolver in the photograph on the Defendant's cell phone was a .32-caliber and that he extracted data from Mr. Williams's cell phone, including three photographs Mr. Williams had received from Mr. Goldtrap depicting a .45-caliber Ruger pistol and gun box, a SIG Sauer pistol, and a Glock pistol with three magazines. Agent Boyd said the Ruger gun box in the photograph was the one found near Cowan Road, where Mr. Williams's truck was disabled. According to Agent Boyd, Mr. Goldtrap routinely sent photographs of his gun inventory to Mr. Williams. Agent Boyd stated that the safe in the closet contained a pharmacy bag with labels for Mr. Goldtrap's prescriptions for oxymorphone and other drugs.

On redirect examination, Agent Boyd testified that Mr. Goldtrap sent the photographs of guns to Mr. Williams on March 20, 2015. Agent Boyd said the TBI investigated Mr. Williams but never charged him with the victims' murders. Agent Boyd stated that the Shell station surveillance recording did not show a white minivan on the road between midnight and 3:30 a.m. on April 14, despite the Defendant's testimony that he went to Taco Bell between midnight and 12:30 a.m.

TBI forensic microanalysis expert Agent Miranda Gaddes testified that she could not determine the physical characteristics of the wire tied around Ms. McDonald's mouth or whether more than one wire was used. She said that some of the wire's coating was completely melted away. Agent Gaddes concluded that the wire found in Ms. Niles's truck was different in color, diameter, and construction from the wire found around Ms. McDonald's mouth. On cross-examination, Agent Gaddes said that none of the five pairs of the Defendant's shoes she tested matched the shoe impressions taken from the crime scene.

Mr. Goldtrap's daughter testified that she and her father used Ms. McDonald's car the last time they went shopping, that her father did not injure his finger, and that she did not stay with the Defendant. On cross-examination, she said that during a visit with her father at the apartment, she brought her dog and that the dog found and chewed up wire.

-15-

The Defense presented no evidence.

Upon this evidence, the Defendant was convicted, and the trial court imposed an effective sentence of life imprisonment plus fifty years. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to establish beyond a reasonable doubt his identity as the perpetrator. Specifically, he argues that his clothing and shoes did not contain any blood or gunshot residue and that Ms. Niles testified that she did not smell smoke on him when he returned home sometime after 4:20 a.m. on April 14, 2015. He also argues that the evidence the victims were shot by two different caliber guns demonstrated that two perpetrators committed the crimes. The State responds that the evidence is sufficient to establish that the Defendant was the perpetrator of the conviction offenses. We agree with the State.

The Defendant contends that the jury's finding that he was the perpetrator of the conviction offenses was contrary to the weight and sufficiency of the evidence. These issues are properly addressed by a sufficiency of the evidence analysis. *See State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993) (stating that after a trial court has discharged its obligation as thirteenth juror and approved the verdict, an appellate court must credit the testimony of the State's witnesses and resolve evidentiary conflicts in the State's favor).

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

Viewed in the light most favorable to the State, the evidence reflects that the Defendant and Mr. Goldtrap used and traded pills and that on April 13, 2015, they had a dispute regarding the procurement of pills. On that date, text messages between Mr. Goldtrap and the Defendant showed that Mr. Goldtrap did not have any pills for the Defendant. However, Ms. Niles testified that on April 13, the Defendant returned from Mr. Goldtrap's apartment with pills and was no longer pill sick. The Defendant testified that he was at Mr. Goldtrap's apartment between 7:30 and 9:00 p.m., consistent with the time the victims' cell phones stopped connecting to cell towers and incoming calls were forwarded to voicemail.

Ms. Niles testified that she lived less than a five-minute-drive from Mr. Goldtrap's apartment. Ms. Niles testified that the Defendant was not home when she woke on April 14, 2015, at 4:00 a.m., that her white minivan was not in the driveway, and that the Defendant did not answer her 4:16 a.m. and 4:20 a.m. calls. That same morning at 4:41 a.m., business surveillance recordings showed a white minivan, which was consistent with Ms. Niles's minivan, driving along a street near the Defendant's home and Mr. Goldtrap's apartment. At 4:47 a.m., only minutes after the surveillance recording showed the white minivan on the road, a 9-1-1 operator received a call reporting a fire at Mr. Goldtrap's apartment. Ms. Niles testified that the Defendant told her to tell officers that he was at home all night on April 13. Mr. Goldtrap's blood was found on the back of the second-row seating in Ms. Niles's minivan. Ms. Niles testified that the Defendant cleaned the minivan on April 14 after speaking to law enforcement at the police station. Officers found cleaning supplies in the minivan, including a carpet stain remover.

Ms. Niles testified that on the morning of April 14, 2015, she drove the Defendant

in the minivan to the scene of the fire and that the Defendant got out of the minivan in his socks at the corner of McFarland Lane outside the crime scene perimeter tape. A video-recorded news report of the scene showed the Defendant standing at the corner. A key and a key tag with Mr. Goldtrap's apartment number were found on the ground where the Defendant stood. Agent Boyd testified that the key and key tag were not there when he walked the perimeter earlier that morning.

Although items in the apartment tested negative for accelerants, Captain Street testified that pour patterns in the apartment were consistent with the use of accelerants and that the fire originated in three separate locations. One gasoline can in Ms. Niles's truck contained traces of an accelerant, as did the Defendant's gloves and shoes.

The evidence showed that Mr. Goldtrap was shot with a .357-caliber handgun and that Ms. McDonald was shot with a .22-caliber revolver. A Sentinel .22-caliber revolver with three bullets and a gun box for a .357-caliber gun were recovered from an area along Cowan Road, behind the Walmart Supercenter. The bullet fragments recovered from Ms. McDonald's body were fired by the Sentinel revolver. The evidence established that the revolver and gun box had belonged to Mr. Goldtrap and that the gun box bore Mr. Goldtrap's DNA. Ms. Niles testified that when the Defendant returned home after 4:20 a.m. on April 14, he said he had been to Walmart to purchase cigarettes because the Shell station did not have his brand. Agent Boyd testified that the Defendant did not appear on the Shell station's surveillance recording between midnight and 5:00 a.m. on April 14. TBI agents found a gun holster near Cowan Road, which was consistent with a holster the Defendant had possessed the day before the murders.

Based on the proof presented, the jury could have found that the Defendant had a key to the apartment, that he had access to guns and wire, that he shot the victims on the night of April 13, 2015, that he took pills and items from the closet safe, that he placed items from Mr. Goldtrap's safe in the minivan, and that he left Mr. Goldtrap's blood on the back of the seats in the process. The jury could have found that the Defendant discarded the .22-caliber revolver used to kill Ms. McDonald, and many of the items from the safe, near Cowan Road and that he set fire to the apartment between 4:00 and 5:00 a.m. The jury also could have found that the Defendant asked Ms. Niles to lie and say he was home on the night of the fire, and that the Defendant cleaned the minivan on April 14 to destroy evidence. In the light most favorable to the State, the evidence is sufficient for a rational jury to have found the Defendant guilty beyond a reasonable doubt of the conviction offenses. The Defendant is not entitled to relief on this basis.

## II

## Evidence from Ms. Niles's Truck

The Defendant contends that the trial court erred in permitting the State to introduce evidence from a gas can, gloves, and wires found in Ms. Niles's truck. The State responds that the evidence is relevant because it is probative of whether the Defendant started the fire with accelerants and gagged Ms. McDonald with wire. We agree with the State.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The record reflects that the Defendant had access to Ms. Niles's truck because it was parked at the Defendant's home and was used by the Defendant. Captain Street found at the apartment pour patterns and burn patterns, consistent with the use of an accelerant, and he concluded the fire originated in three different locations. Traces of accelerant were found on the gas can and on the Defendant's gloves found in the truck. The gas can and gloves were probative of whether the Defendant used an accelerant to start the fires at the apartment. The truck also contained wire in various colors and diameters. Ms. McDonald's mouth was found with wire wrapped around it. Although the wire in the truck did not match the color or diameter of the wire used to gag Ms. McDonald, the wire in the truck was probative of whether the Defendant had access to wire. *See* Tenn. R. Evid. 401, 402, 403.

In his brief, the Defendant argues that the prejudicial effect of admitting the items from the truck substantially outweighed any probative value those items might have. *See*

-19-

Tenn. R. Evid. 403. The Defendant, however, did not provide any argument showing how the defense was prejudiced. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]"). We decline to speculate as to the Defendant's theory regarding prejudice. We cannot conclude that the probative value of the items in the truck was substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion by admitting the evidence from Ms. Niles's truck. The Defendant is not entitled to relief on this basis.

## III

## Photographs of Victims

The Defendant contends that the trial court erred in permitting the State to offer photographs of the victims with their children because the photographs were not probative of any issue at the trial and were likely to "garner sympathy." The State responds that the photographs were relevant and not unfairly prejudicial.

The record reflects that Ms. McDonald's mother identified a photograph of Ms. McDonald and her daughter that was taken within a couple of months of the murder. Mr. Goldtrap's father, likewise, identified a photograph of Mr. Goldtrap and his five-year-old daughter. The trial court admitted the photographs, overruling the Defendant's objection that the photographs were not "appropriate."

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In determining whether evidence, including photographs of a homicide victim, is relevant and admissible, a trial court "should consider the questions of fact to be presented to the jury and any evidence presented during the course of the trial." *State v. Adams*, 405 S.W.3d 641, 657 (Tenn. 2013); *see State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995); *State v. Dulsworth*, 781 S.W.2d 277, 287 (Tenn. Crim. App. 1989). A trial court's decision to admit a photograph is reviewed for an abuse of discretion and "absent an abuse of that discretion, will not result in the grant of a new trial." *Adams*, 405 S.W.3d at 657; *see State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006).

Our supreme court has "consistently cautioned" the State against introducing portrait-style photographs taken during a homicide victim's life. *Adams*, 405 S.W.3d at 657; *see State v. Cole*, 155 S.W.3d 885, 911-12 (Tenn. 2005) (Although a "family photograph may be relevant to establish the victim's identity as the person killed," the photograph must be "relevant to an issue that the jury must decide before it may be admitted into evidence."); *see also Young*, 196 S.W.3d at 106 ("In assessing probative value, the court must understand the proof and theory of the case, and whether there is a *real dispute* about the issue the evidence is to prove.") (emphasis in original) (internal quotation and citation omitted); *State v. Nesbit*, 978 S.W.2d 872, 902 n.3 (Tenn. 1998) (stating that photograph evidence may be inadmissible "where the victim's identity has already been proven" because "further proof may be cumulative and, therefore, inadmissible").

Since 2015, the Victims' Bill of Rights has provided that "an *appropriate* photograph" of a homicide victim "shall be admissible evidence when offered . . . to show the general appearance and condition of the victim while alive." T.C.A. § 40-38-103(c) (2019) (emphasis added); 2015 Tenn. Pub. Acts, ch. 527. However, the admissibility of such photographs remains subject to the Tennessee Rules of Evidence. *See State v. Glenn Allen Donaldson*, No. E2019-00543-CCA-R3-CD, 2020 WL 2494478, at *10 (Tenn. Crim. App. May 14, 2020) (stating that although the statute requires the admission of a photograph, a trial court "retains the discretion to determine whether a life photograph . . . is appropriate" and "may nevertheless exclude a photograph, even if relevant to show the victim's 'general appearance and condition' . . . if the court determines that 'its probative value is substantially outweighed by the danger of unfair prejudice[.]'" (quoting T.C.A. § 40-38-103(c), Tenn. R. Evid. 403)), *perm. app. denied* (Tenn. Sept. 9, 2020). As a result, a photograph, should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id*. Further, this court has disfavored a trial court's admitting a victim's photograph without considering "whether the probative value of the victim's general appearance before death was substantially outweighed by the danger of unfair prejudice to the Defendant." *State v. Shannon Foster*, No. E2020-00304-CCA-R3-CD, 2021 WL 3087278, at *25 (Tenn. Crim. App. July 22, 2021), *perm. app. denied* (Tenn. Dec. 8, 2021).

We do not agree with the Defendant that Tennessee Code Annotated section 40-38-103(c) requires a homicide victim's photograph to depict only the victim. The record does not reflect why the State selected photographs depicting the victims with their children. Although we are concerned about the possibility of the photographs appealing to the jurors' sympathies and emotions because of the inclusion of the victims' children, we cannot conclude that the probative value of the victims' appearance before death was substantially outweighed by the danger of unfair prejudice to the defense. Considering that both victims were shot in the head and that Ms. McDonald's body was severely burned, the photographs were relevant to show the jury the general appearance and

-21-

condition of the victims when they were alive. *See* T.C.A. § 40-38-103(c). Further, the photographs did not prejudice the defense by providing new information about the victims' children to the jury. The jury heard Ms. McDonald's mother's testimony that Ms. McDonald had a young child, and Mr. Goldtrap's daughter testified at the trial. The trial court did not abuse its discretion by admitting photographs of the victims. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE